## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| **RACHAEL E. MCLEOD,** | ) | |
| **PLAINTIFF,** | ) | **CASE NO.** |
| | ) | |
| **VS.** | ) | |
| | ) | **COMPLAINT** |
| **SOUTHEAST COMMUNITY** | ) | **(JURY DEMAND)** |
| **COLLEGE AREA, PAUL ILLICH,** | ) | |
| **BRUCE TANGEMAN, AND JOEL** | ) | |
| **MICHAELIS,** | ) | |
| **DEFENDANTS.** | ) | |

    **COMES NOW**, Plaintiff, RACHAEL E. MCLEOD, by and through her attorney, John D. Cartier, files their Complaint complaining of the acts of Southeast Community College Area, Paul Illich, Bruce Tangeman, and Joel Michaelis ("Defendants"). This is a civil action for sex discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964, the Nebraska Fair Employment Practice Act ("NFEPA"), 42 U.S.C. § 1983, including retaliation for First Amendment-protected activity. Plaintiff also brings claims based on official policy and custom liability under § 1983.

### JURISDICTION AND VENUE

1. This Court has jurisdiction over Plaintiff's federal claims pursuant to 28 U.S.C. §§ 1331 and 1343.

2. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367.

3. Venue is proper under 28 U.S.C. § 1391(b) and 42 U.S.C. § 2000e-5(f)(3) because the acts occurred in the District of Nebraska.

4. Plaintiff has met the administrative requirements of this action in that she filed a charge of discrimination with the Nebraska Equal Opportunity Commission and the Equal Employment Opportunity Commission and received a Notice of Right to Sue from both entities and timely filed suit with this Court.

### PARTIES

5. Plaintiff, Rachael E. McLeod, is a resident of Lancaster County, Nebraska and was at all times relevant hereto, an "employee" of the Defendant(s) within the meaning of FEPA, Title VII, and Neb. Rev. Stat. § 48-1104.

6. Defendant Southeast Community College Area ("SCC" or "College") is a political subdivision of the State of Nebraska, headquartered in Lincoln, Nebraska. At all

relevant times, SCC was Plaintiff's employer within the meaning of NFEPA and Title VII, 42 U.S.C. § 2000e(b).

7.  Defendant Paul Illich is the President of SCC. He is sued in his individual capacity for purposes of Plaintiff's claims under 42 U.S.C. § 1983 and is personally liable for acts of discrimination and retaliation under NFEPA to the extent Nebraska law recognizes individual liability for supervisors directly participating in discriminatory acts.

8.  Defendant Bruce Tangeman is the Vice President of Human Resources at SCC. He is sued in his individual capacity for purposes of Plaintiff's claims under 42 U.S.C. § 1983 and under the NFEPA for direct participation in discriminatory and retaliatory acts.

9.  Defendant Joel Michaelis is the Vice President of Instruction at SCC. He is sued in his individual capacity for purposes of Plaintiff's claims under 42 U.S.C. § 1983 and under the NFEPA to the extent his conduct contributed to discrimination against Plaintiff.

## **FACTUAL BACKGROUND**

10. Plaintiff is a female who was hired by Defendant on July 1, 2014.

11. Plaintiff's performance was consistently satisfactory.

12. In March 2022, Defendant Joel Michaelis, Vice President of Instruction, made derogatory and sexist remarks about professional women, including calling a female colleague a "dick" during a conversation with Plaintiff.

13. On or about March 2022, Joel Michaelis also made a sexist comment during a meeting that included Plaintiff and Carolee Ritter (Dean of Arts & Sciences).

14. His comment referenced an external female colleague whose professional manner Joel Michaelis complained of as being too harsh, stating "I guess that's just the way professional women have to behave in a man's world."

15. Shortly after these comments, Plaintiff later confronted Joel Michaelis directly about the language he used to describe professional women.

16. Thereafter, Joel Michaelis became dismissive of Plaintiff's team, which was comprised of all females.

17. When Plaintiff or a member of her team requested information from Joel Michaelis for grant work, which was essential to her job, her requests were repeatedly dismissed by him.

18. Plaintiff brought these concerns to Amy Jorgens, her supervisor, and she directed Plaintiff to continue documenting the lack of responsiveness, which Plaintiff did.

19. When Joel Michaelis finally did respond via email, he indicated in a flip tone that he does things differently than Dennis (meaning Dennis Headrick, his predecessor).

20. In May 2022, Plaintiff filed a formal sex-based complaint against Joel Michaelis to SCC's HR because of Mr. Michaelis's derogatory comments about professional women and because Mr. Michaelis's behavior was impeding her ability to do her job.

21. Upon Plaintiff making the formal complaint to HR about Joel Michaelis, the appointed investigator, Robert Sanford, Administrative Director of Title IX, asked Plaintiff to provide a list of other witnesses.

22. Via email on May 20, 2022, Plaintiff provided a list of 10 people who were witnesses to Joel Michaelis's behavior.

23. The College did not interview them as part of their investigation.

24. Plaintiff believes the other witnesses were not interviewed because the Administration did not want to officially document examples of Joel Michaelis's sexist conduct.

25. On May 31, 2022, Plaintiff did an in-person interview with the investigation team to describe her experiences that led to the complaint.

26. On June 15, 2022, Plaintiff met with Robert Sanford and Sarah Murtagh, Administrative Director of HR, where they told Plaintiff that the investigation had concluded and that Joel Michaelis's behavior didn't rise to the level of a Title IX offense.

27. Joel Michaelis had a pattern and reputation across SCC of inappropriate comments, sexist behavior, and off-color language. This behavior was known to his supervisor, Paul Illich, and generated multiple informal complaints against Joel Michaelis between his hiring in mid-2020 and May 2022.

28. In addition, the College administration had a culture of systemic exclusion and favoritism, which tolerated more favorable treatment toward men and less favorable treatment toward women.

29. In some cases, Paul Illich himself engaged in behavior that disadvantaged female employees while giving more favorable treatment to male employees, particularly those he personally favored.

30. For example, on May 31, 2022, Amy Jorgens, Plaintiff's supervisor, told Plaintiff and Bev Cummins that she had been treated by Joel Michaelis in a sexist manner in multiple Administrative Team meetings.

31. Bev Cummins said that she had witnessed this treatment because she also attends Administrative Team meetings.

32. In another example, on Sept. 7, 2022, Plaintiff had lunch with Bev Cummins, Vice President of Program Development, where Ms. Cummins told Plaintiff that she experienced sexism at the College.

33. Bev Cummins stated that when Joel Michaelis or Brett Bright, then-Vice President of Program Development, did not have the skills to accomplish an assigned duty, Paul Illich would reassign the duty to her instead.

34. For example, Ms. Cummins stated she had recently been assigned the duty of program development when Brett Bright, who is compensated at the highest pay classification at the College (A1), could not do the job.

35. Plaintiff and Ms. Cummins also spoke about the administration's pattern of hiring men in roles despite not being qualified and being kept in those roles even after they demonstrated lack of qualifications for those roles.

36. In mid-2024, Bev Cummins announced she would be taking extended time off to rest after spending time in the hospital for a stress-induced cardiac episode.

37. In Fall 2024, a colleague shared with the Plaintiff during a conversation in her office, that they expressed to Bev Cummins their concerns about Paul Illich giving her so many extra projects. They said they told Ms. Cummins that it "would kill her" if she didn't set more boundaries with Paul Illich with respect to assigned duties.

38. In another example, Plaintiff's list of witnesses in her complaint against Joel Michaelis included one person who told Plaintiff that Joel Michaelis had been witnessed joining a work meeting via Zoom on his cell phone in his parked vehicle from a location outside the College. The witness said signs indicating Joel Michaelis was parked at a strip club were visible behind him.

39. Shortly after, Plaintiff told Paul Illich about this event, to which he responded he hoped it wasn't true.

4

40. In another example, sometime in 2021, Paul Illich told Plaintiff in a meeting in his office that he had assigned Joel Michaelis to do the golf networking on behalf of SCC with other senior executives in Lincoln. He told Plaintiff he asked Joel Michaelis to do this because it was something Joel Michaelis enjoyed doing and because Mr. Illich himself didn't enjoy playing golf.

41. Sometime in 2022, Katy Novak, liaison to Paul Illich, told Plaintiff during a conversation in Ms. Novak's office that Paul Illich was beginning to worry about his decision to ask Joel Michaelis to network with senior executives on behalf of the College.

42. The reason he gave Ms. Novak for being worried was because he couldn't be sure what Joel Michaelis would say and acknowledged the potential that Joel Michaelis could say something that might reflect negatively on the College.

43. In another example, sometime in early 2021, Sarah Kramer (female), former Administrative Director of Human Resources, told Plaintiff that she had shared with Paul Illich that she believed Joel Michaelis "was a liability to the College," because of his behaviors and language toward others, particularly female employees.

44. Plaintiff was aware that Sarah Kramer resigned from the College in Sept. 2021, in part because she did not feel the president was heeding her professional advice about Joel Michaelis, and she did not feel comfortable defending Joel Michaelis on Paul Illich's behalf knowing that more was not being done to address the behavior.

45. In an email from Jose Soto, former Vice President of Access/Equity/Diversity (AED), to Plaintiff on May 18, 2022, Mr. Soto acknowledged multiple complaints about Joel Michaelis's behavior.

46. In his email, he stated "I want you to know that steps have been taken in the past, and currently, to address concerns expressed about Joel's behavior and interactions. Those steps have been supervisory in nature and not within the purview of my office."

47. "Supervisory in nature" indicates that Joel Michaelis's behavior was being handled between him and Paul Illich, his supervisor, as opposed to official and documented disciplinary mechanisms through Human Resources.

48. Plaintiff believes this was intentional in order to minimize evidence of complaints against Joel Michaelis.

49. Plaintiff was subsequently denied training, professional growth, and advancement opportunities and subjected to different terms and conditions of employment due to her sex and in retaliation for her complaint about sex discrimination.

50. In July 2023, Plaintiff learned that Robert Sanford, Title IX Coordinator/Administrator (Male), had been receiving training and mentoring to prepare him for potential future roles within Human Resources and Equity and Inclusion.

51. In July 2023, Plaintiff was informed by Laura Thompson, Publications Specialist in the Marketing Department (female), that Robert Sanford had approached Human Resources inquiring about an open position but was told to "hold off" because they had "something else in mind" for him.

52. Around this time, Plaintiff also noticed an increase in one-on-one meetings between Bruce Tangeman and Robert Sanford.

53. In an in-person meeting with Bruce Tangeman on Aug. 15, 2023, Mr. Tangeman reassured Plaintiff that Robert Sanford was "just helping out" and was "not involved in the day-to-day activities" of the HR department.

54. Shortly afterward, Robert Sanford also began interacting with the HR team as if he was officially part of the HR team.

55. For example, Robert Sanford would let other HR employees know when he was leaving for the day or pop into their offices for work- and non-work-related conversations.

56. In addition, Plaintiff noticed that Robert Sanford began attending HR's weekly team meetings. Plaintiff noticed this because her office was in between the HR department and Robert Sanford's office. All meetings were held remotely (meaning they all stayed in their own offices), even when all HR team members were in the building.

57. Plaintiff also witnessed Bruce Tangeman and Robert Sanford meeting from their respective offices via Zoom even though their offices are only three doors apart.

58. Plaintiff believes attending meetings from their separate offices was done in an effort to conceal Robert Sanford's growing role in the HR department, beyond "just helping out" with contract negotiations.

59. Robert Sanford received specific mentoring and training in contract negotiation at SCC, a vital part of Bruce Tangeman's current position.

60. For example, on Nov. 14, 2023, Plaintiff witnessed Bruce Tangeman and Robert Sanford together attend a contract negotiation session with SCC's faculty association.

61. This experience was another unique opportunity for Robert Sanford to experience and learn about the negotiation process within the specific organizational context of SCC.

62. Robert Sanford was also informally appointed interim Vice President of Access/Equity/Diversity (AED), providing him with additional essential skills.

63. As part of the interim position, he supervised AED staff and led AED team meetings.

64. This interim role also gave Robert Sanford access to experiential learning around AED at the college, including participating in discrimination cases that cross over into HR, that otherwise would have been conducted by Jose Soto (former Vice President of AED).

65. Robert Sanford also worked with the two AED staff to create a new system for recording diversity credits.

66. These experiences provided valuable knowledge and skills that increased Robert Sanford's competitiveness as a candidate/applicant for future roles, particularly as the college continued to make restructuring changes around AED and Human Resources.

67. Paul Illich and Bruce Tangeman were aware of Plaintiff's interest in senior positions in Access/Equity/Diversity (AED) and Human Resources (HR) because Plaintiff had had multiple communications with them about it between 2020 and 2022, in person and via email.

68. For about two years prior to fall 2023, it was widely known at the college that the Administration was anticipating the retirement of Jose Soto, Vice President of AED, and Bruce Tangeman, Vice President of HR, within the next couple years.

69. Despite explicitly expressing interest in both HR and AED positions over a two-year period, Plaintiff was never offered mentorship opportunities, training, experiential learning, professional experiences, or advancement related to these two areas.

70. During this time, Plaintiff inquired repeatedly with Paul Illich about the college's plan for positions in those areas and was repeatedly told that no decisions had been made yet.

71. For example, Plaintiff had multiple in-person meetings with Paul Illich in late 2020 through mid 2021, where she expressed interest in growing her career at SCC and her interest in being considered for Jose Soto's position because his position oversaw areas that Plaintiff was interested in, such as disability accommodations, legal compliance, and College climate.

72. Again, she was told that no decisions had been made yet.

73. In another example, Plaintiff had an in-person meeting with Bruce Tangeman in his office on Jan. 24, 2022, to express her interest in HR and to inquire about how she might increase her skills in HR processes.

74. Later that day, Bruce Tangeman emailed Plaintiff with a link to the SHRM website, an organization for HR professionals, to review on her own.

75. Plaintiff was never offered training, mentorship, professional growth, or experiential learning opportunities as Robert Sanford was.

76. Upon learning Robert Sanford was receiving preferential treatment, Plaintiff sent an email to Bruce Tangeman and Paul Illich, SCC President (Male), on Aug. 10, 2023. Plaintiff stated she had been expressing interest in positions related to AED and HR for the past two years.

77. Plaintiff also requested transparency around plans for upcoming roles and plans for successors or potential restructuring because it was clear that Robert Sanford was being offered material and experiential opportunities that Plaintiff was not, despite her experience, expertise, and interest.

78. After Plaintiff sent the email, Paul Illich came to Plaintiff's office the same day and told her that Robert Sanford was "just helping Bruce out with some contract negotiation stuff."

79. On Aug. 15, 2023, Bruce Tangeman met with Plaintiff in person and again claimed Robert Sanford was "just helping out" while a determination was made about departments and positions. Tangeman told Plaintiff a decision about future positions would be made "sometime in 2024."

80. This meant a delay of up to an additional year to making a decision on a plan.

81. On Oct. 4, 2023, Plaintiff emailed Paul Illich and Bruce Tangeman again to explicitly express interest in mentoring and advancement opportunities in AED

and HR. Bruce Tangeman responded via email that they "could not provide a specific response at this time."

82. Plaintiff and Robert Sanford are similarly situated with respect to access/equity/diversity (AED), workplace investigations, contract negotiations, and HR processes skill sets. However, unlike Plaintiff, Robert Sanford, a male employee, was hand-selected for specialized training and advancement opportunities.

83. Both reported to a vice president at SCC.

84. Both are highly skilled and have advanced degrees that can be applied in HR and AED areas.

85. Neither Sanford nor Plaintiff have an HR background, but each knows certain aspects of HR processes.

86. When Robert Sanford was promoted in July 2023, Plaintiff had worked at the College for 9.5 years. Sanford had been at the College for 1.5 years.

87. Plaintiff had 10 years of professional experience in compliance at the College related to contracts, including reviewing, revising, drafting, and interpreting contract language as part of her daily administrator responsibilities.

88. Plaintiff has experience in contract negotiations with government agencies since about 25% of the department's grant contracts require a contract negotiation phase.

89. Plaintiff is an experienced mediator of difficult conversations.

90. Plaintiff has been actively involved in workplace investigations during her time at the College. She is also CAAP certified (Certified Affirmative Action Professional) through the American Association of Access, Equity, and Diversity (AAAED). This certification includes training in EEO workplace investigations.

91. Plaintiff has more supervisory experience than Robert Sanford, having supervised and co-supervised 10 or more employees as part of her role leading her department.

92. Plaintiff has vast experience at the College in many processes of HR. These include investigating employee matters, handling disciplinary matters, reviewing/updating policies, and strategic planning.

93. Plaintiff also has participated in all aspects of the hiring process, including writing interview questions, creating and leading interview teams, working in

HR's electronic hiring platform, onboarding, and calculating salaries and benefits.

94. Paul Illich is the President of SCC.

95. Paul Illich had a pattern of using his administrative powers to treat women differently and to protect those he had a personal relationship with, which contributed to the culture of systemic cronyism and exclusion at the college.

96. Paul Illich had two primary motivations for protecting Joel Michaelis from multiple complaints and for discriminating and retaliating against the Plaintiff.

97. His first motivation is that Joel Michaelis is the son of Paul Illich's former supervisor, Dennis Michaelis.

98. Dennis Michaelis was the President of McLennan Community College in Waco, Texas. McLennan Community College was Paul Illich's employer prior to Paul Illich taking the position as President at SCC.

99. Plaintiff believes Paul Illich's decision to hire Joel Michaelis was cronyism or favoritism and was done as a favor to his former boss, Dennis Michaelis, to help Joel Michaelis make progress toward his goal of becoming a College president himself someday.

100. Several colleagues at SCC told Plaintiff they shared this belief, and that when Joel Michaelis was interviewing, they did not believe he was the right or best candidate for the position.

101. For example, Vicki Domina, a former employee at SCC, sat in on one of the interviews with Joel Michaelis.

102. Ms. Domina told Plaintiff that right after the interview, Paul Illich approached her and pressured her to agree that Joel Michaelis was a great fit for the position, when in reality, she did not feel that way.

103. In another example, Randy Nelson and Rod Rhodes, former employees of the College, sat in on interviews with Joel Michaelis and told Plaintiff they didn't know why Paul Illich was even bothering with the hiring process when no one's opinion mattered but his.

104. They believed Paul Illich's decision to hire Joel Michaelis was a favor to his former boss, who is Joel Michaelis's father.

105. They also noted Paul Illich had a pattern of hiring the person he wanted for a position even if the hiring team recommended a different candidate.

106.    For example, after interviewing candidates to lead the newly created Office of Advancement, Paul Illich selected Rick Blessen (male) from the interview pool over the recommendation of the hiring team.

107.    The hiring team had recommended a female.

108.    After Rick Blessen was hired, Plaintiff was made aware that Rick was struggling in the position and that he was on the verge of being demoted.

109.    To support Mr. Blessen, Paul Illich took multiple actions.

110.    For example, Ms. Novak shared that she had been assigned by Paul Illich to "keep Rick on track" with his Advancement projects.

111.    In another example, Paul Illich had the College hire a part-time external grant writer (a female) to assist Rick Blessen in his duties.

112.    In another example, Plaintiff's department (all females) was also enlisted by Paul Illich to help Rick Blessen with tracking Advancement projects and moving them forward.

113.    There are other examples of the Administration hand-selecting male employees for positions.

114.    For example, a new position called Associate Vice President of Student Enrollment was created in May 2022.

115.    Instead of posting the position to give internal and external candidates an opportunity to apply, Administration gave the position to Mike Pegram (male).

116.    Mike Pegram received a promotion, a new title, new leadership roles, and a salary increase, and was classified in the second highest pay category (A2), as a result of being given the position.

117.    Plaintiff believes Paul Illich's personal relationship with and connection to Joel Michaelis and Dennis Michaelis is, in part, what motivated him to punish Plaintiff by denying her mentorship opportunities, professional development experiences, training, and advancement, giving those opportunities instead to Robert Sanford (male).

118.    In addition to Paul Illich's personal connection to Joel Michaelis, there was another motivation for his behavior toward Plaintiff.

119.    Plaintiff was aware from interactions with colleagues that Joel Michaelis's predecessor, Dennis Headrick, and Paul Illich, did not get along.

120.    Shortly after Dennis Headrick retired, he sent a letter critical of Paul Illich to the SCC Board of Governors.

121.   It was widely known that Paul Illich was angry with Dennis Headrick about the letter and embarrassed about its dissemination to the Board.

122.   Sometime in 2021, in a meeting with Paul Illich in his office, Plaintiff shared with Paul Illich that some at the College had expressed to the Plaintiff that they felt Paul Illich had hired Joel Michaelis as a personal favor to Dennis Michaelis, Joel's father.

123.   Paul Illich said that the hiring process was legitimate.

124.   Paul Illich also stated to Plaintiff "Don't you know what Dennis did?" referring to the critical letter Dennis Headrick had sent to the SCC Board of Governors.

125.   Plaintiff interpreted this to mean Paul Illich felt he was justified in hiring someone he could count on to support his administrative agenda.

126.   Plaintiff interpreted this as additional evidence that the hiring process had not been fair, and that Paul Illich had intended to hire Joel Michaelis all along, regardless of who was in the candidate pool or who the hiring team recommended.

127.   Plaintiff believes Paul Illich's desire to have a person in the role that he could trust to support his administrative agenda was further motivation for Paul Illich to punish her by denying her mentorship opportunities, professional development experiences, training, and advancement, giving those opportunities to Robert Sanford (male) instead.

128.   Plaintiff believes she was denied opportunities for mentorship, professional development experiences, training, and advancement in part because her complaint could jeopardize Joel Michaelis being in the position that Paul Illich wanted him in.

129.   Paul Illich's treatment of Plaintiff was also part of a systemic pattern and culture of favoritism of males over females at the college.

130.   SCC has a pattern of denying advancement opportunities to female employees who were similarly situated to male candidates.

131.   Leslie Chloupek (female) was the interim Administrative Director of Marketing & Communications at the College. When the Administrative Director retired, she applied for the Administrative Director position. Despite more than a year of experience as the co-leader of the department, a male outside the College was hired for the position instead.

132.   Erin May (female) was the Administrative Director of Career Academies & Dual Credit at the College. When the Senior Administrative Director retired, she applied for the position.

133.   Despite many years of experience as the co-leader of the department, a male outside the College was hired for the position instead.

134.   When Erin May (female) left the College, Audra Olsen (female), an internal candidate, applied for Ms. May's position. A similarly situated male candidate was selected instead.

135.   Audra Olsen (female) applied for the position of Director of Workforce Solutions. A similarly situated internal male candidate was selected instead.

136.   Denial of training, mentoring, experiential learning, and advancement opportunities and being subject to different terms of employment have impacted Plaintiff's career progression and opportunities at the college.

137.   Plaintiff has experienced professional stagnation by being denied training, mentoring, and experiential learning opportunities beginning in Fall 2023.

138.   Plaintiff has experienced professional stagnation, including missed opportunities for potential advancement and salary increase beginning in Fall 2023.

139.   Plaintiff has experienced professional stagnation by being denied new leadership and professional growth opportunities beginning in Fall 2023.

140.   Plaintiff suffered emotional and reputational harm as a result of being denied training, mentoring, experiential learning, and advancement opportunities and being subject to different terms and conditions of employment.

141.   For example, she faced stigma and social isolation from senior administrators who began to interact with Plaintiff with caution or would avoid her all together.

142.   In another example, she faced stigma and social isolation when other colleagues at the college avoided her because they feared retaliation themselves if they were seen engaging with her.

143.   Plaintiff felt a sense of hopelessness, fear, and dread with respect to the stagnation of her career at the college and the uncertainty about her professional and employment future.

144.   Plaintiff experienced increased mental health challenges including severe stress, depression, anxiety, and sleeplessness that required medical and psychological treatment.

145.   Plaintiff's reports of sex discrimination were made in her capacity as a private citizen and addressed systemic issues of sex-based inequity, which are matters of public concern.

146.   Plaintiff's reports of sex discrimination were outside the chain of command.

147.   Plaintiff's reports of sex discrimination were not part of any job obligation.

148.   Plaintiff's reports of sex discrimination were raised to Human Resources or to parties outside of her department.

149.   Plaintiff's reports of sex discrimination were intended to expose broader institutional issues out of public concern.

### CAUSES OF ACTION

### COUNT I:
### Sex Discrimination in Violation of Title VII of the Civil Rights Act of 1964
### (Against Defendant SCC)

150.   Plaintiff realleges and incorporates by reference all preceding paragraphs.

151.   Plaintiff is a female and a member of a protected class. She was hired by Defendant SCC in 2014 and consistently performed her duties in a satisfactory manner.

152.   In 2022, a senior SCC official, Vice President of Instruction Joel Michaelis, made sexist remarks, such as referring to a female colleague as a "dick" and stating that "professional women have to behave a certain way in a man's world."

153.   After Plaintiff confronted Michaelis about his language, he became dismissive of Plaintiff's team, comprised entirely of women, and failed to cooperate with their requests for information necessary for their grant work.

154.   Plaintiff filed a formal complaint in May 2022, providing a list of ten witnesses to Michaelis's conduct, none of whom were interviewed by the college.

155.   Plaintiff was subsequently denied opportunities for training, mentorship, and advancement, which were instead offered to a less experienced male employee, Robert Sanford.

156.   Sanford was mentored and included in HR meetings, contract negotiations, and interim leadership assignments, despite having only 1.5 years of experience

compared to Plaintiff's 9.5 years and greater relevant qualifications.

157.   Plaintiff had previously expressed sustained interest in HR and Access/Equity/Diversity roles, including meetings and email communications with senior leadership, but she was excluded from advancement opportunities.

158.   These facts demonstrate that Plaintiff was treated less favorably than similarly situated male colleagues, and that SCC's conduct was motivated by sex-based animus in violation of Title VII, 42 U.S.C. § 2000e-2(a).

159.   SCC's conduct constitutes intentional sex discrimination in violation of Title VII, causing Plaintiff economic loss, reputational harm, and emotional distress.

## COUNT II:

## Retaliation in Violation of Title VII

## (Against Defendant SCC)

160.   Plaintiff realleges and incorporates by reference all preceding paragraphs.

161.   Plaintiff engaged in protected activity under Title VII by filing a formal sex discrimination complaint against Michaelis in May 2022 and raising concerns about discriminatory practices to Defendants Illich and Tangeman in August and October 2023.

162.   Following her protected activity, Plaintiff suffered adverse employment actions, including denial of training, mentorship, and advancement opportunities, professional isolation, and career stagnation.

163.   A causal connection exists between Plaintiff's protected activity and the adverse actions, as evidenced by: (a) the temporal proximity between her complaints and the denial of opportunities; (b) the preferential treatment of Sanford immediately after Plaintiff's complaints; and (c) Defendants' misrepresentations about Sanford's role and future position decisions.

164.   SCC's actions constitute unlawful retaliation in violation of Title VII, 42 U.S.C. § 2000e-3(a), causing Plaintiff economic loss, reputational harm, and emotional distress.

## COUNT III:

## Sex Discrimination in Violation of the NFEPA

## (Against All Defendants)

165.  Plaintiff realleges and incorporates by reference all preceding paragraphs.

166.  Plaintiff is a female employee protected under the Nebraska Fair Employment Practice Act.

167.  Plaintiff was qualified for her position and performed her duties satisfactorily.

168.  Defendants subjected Plaintiff to adverse employment actions by denying her training, mentorship, experiential learning, and advancement opportunities, while providing these to a less experienced male employee, Robert Sanford.

169.  SCC engaged in a pattern of elevating male employees over more qualified internal and external female candidates. Examples include the promotions of Rick Blessen and Mike Pegram over female applicants or without open competition.

170.  Defendants' actions were motivated by Plaintiff's sex, as evidenced by: (a) SCC's pattern of promoting male employees over qualified females; (b) Michaelis's sexist conduct and the failure to address it; and (c) Illich and Tangeman's preferential treatment of Sanford despite Plaintiff's qualifications and interest.

171.  Defendants' conduct constitutes intentional sex discrimination in violation of NFEPA, causing Plaintiff economic loss, reputational harm, and emotional distress.

### COUNT IV:

### Retaliation in Violation of NFEPA

### (Against All Defendants)

172.  Plaintiff realleges and incorporates by reference all preceding paragraphs.

173.  Plaintiff engaged in protected activity under NFEPA by reporting sex discrimination and raising concerns with SCC leadership.

174.  Defendants subjected Plaintiff to adverse employment actions, including exclusion from advancement and professional development, isolation, career stagnation, as well as reputational harm.

175.   A causal connection exists between Plaintiff's protected activity and the adverse actions, as evidenced by the timing of the denials and Defendants' misrepresentations about Sanford's role.

176.   Defendants' actions constitute unlawful retaliation in violation of NFEPA, Neb. Rev. Stat. § 48-1114, causing Plaintiff economic loss, reputational harm, and emotional distress.

**COUNT V:**

**Retaliation in Violation of 42 U.S.C. § 1983 and the Equal Protection Clause**

**(Against Defendants Illich, Tangeman, and Michaelis in Their Individual Capacities)**

177.   Plaintiff realleges and incorporates by reference all preceding paragraphs.

178.   At all relevant times, Defendants Illich, Tangeman, and Michaelis acted under color of state law and in their roles as officials of SCC.

179.   Plaintiff engaged in constitutionally protected conduct by reporting sex-based discriminatory actions by Defendant Michaelis and systemic inequities affecting female employees at SCC.

180.   In direct response to Plaintiff's protected conduct, Defendants subjected Plaintiff to adverse employment actions, including but not limited to denial of training and mentorship opportunities, exclusion from professional meetings and decision-making processes, professional isolation, and stagnation in her career advancement.

181.   Similarly situated male employees were provided preferential treatment, mentorship, and advancement opportunities that were systematically denied to Plaintiff.

182.   Defendants' actions were substantially motivated by discriminatory and retaliatory animus based on Plaintiff's sex and her protected opposition to sex-based discrimination, as evidenced by: (a) Michaelis's sexist remarks and obstruction of Plaintiff's work; (b) Illich's pattern of favoring male employees, including Michaelis and Sanford; and (c) Tangeman's role in grooming Sanford for advancement while excluding Plaintiff.

183.   Defendants retaliated against Plaintiff for reporting sex discrimination, a protected activity under the Equal Protection Clause, by subjecting her to adverse actions, including professional isolation and career stagnation.

184.   Through their conduct, Defendants Illich, Tangeman, and Michaelis intentionally deprived Plaintiff of her rights under the Equal Protection Clause of the Fourteenth Amendment, in violation of 42 U.S.C. § 1983.

185.   Defendants' actions were willful, malicious, taken in bad faith, and outside the scope of any legitimate official duties, entitling Plaintiff to punitive damages.

186.   As a direct and proximate result of Defendants' unconstitutional conduct, Plaintiff has suffered and continues to suffer economic loss, emotional distress, reputational harm, and other damages in an amount to be determined at trial.

**COUNT VI:**

**First Amendment Retaliation in Violation of 42 U.S.C. § 1983**

**(Against Defendants Illich, Tangeman, and Michaelis in Their Individual Capacities)**

187.   Plaintiff realleges and incorporates by reference all preceding paragraphs.

188.   At all relevant times, Defendants Illich, Tangeman, and Michaelis acted under color of state law and in their official roles at SCC.

189.   Plaintiff engaged in constitutionally protected speech by reporting sex discrimination, systemic inequities, favoritism, and misuse of authority at SCC. Plaintiff's speech addressed matters of public concern and was made outside the scope of her official job duties, including through complaints to Human Resources and senior leadership.

190.   Following Plaintiff's protected speech, Defendants engaged in retaliatory actions against her, including but not limited to denial of training and mentorship opportunities, exclusion from professional development activities, isolation from administrative decision-making processes, and adverse impacts on Plaintiff's professional growth and reputation.

191.   Defendants' actions were substantially motivated by Plaintiff's exercise of her rights under the First Amendment to the United States Constitution.

192.   Through their conduct, Defendants Illich, Tangeman, and Michaelis intentionally deprived Plaintiff of her clearly established rights to free speech, in violation of 42 U.S.C. § 1983.

193.   Defendants Illich, Tangeman, and Michaelis, acting under color of state law, retaliated against Plaintiff for exercising her First Amendment rights by subjecting her to adverse employment actions, including denial of training opportunities, exclusion from meetings, and hindrance of career advancement.

194. A causal connection exists between Plaintiff's protected speech and the adverse actions, as evidenced by the timing of the retaliation and Defendants' preferential treatment of Sanford.

195. Defendants' actions were willful, malicious, taken in bad faith, and outside the scope of any legitimate official duties, entitling Plaintiff to punitive Damages.

196. As a direct and proximate result of Defendants' unconstitutional retaliation, Plaintiff has suffered and continues to suffer economic loss, emotional distress, reputational harm, and other damages in an amount to be determined at trial.

**COUNT VII:**

**Retaliation in Violation of 42 U.S.C. § 1983 and the Equal Protection Clause**

**(Against Defendants Illich, Tangeman, and Michaelis in Their Individual Capacities)**

197. Plaintiff realleges and incorporates by reference all preceding paragraphs.

198. Defendants Illich, Tangeman, and Michaelis acted under color of state law at all relevant times.

199. Plaintiff reported sex-based discriminatory conduct by Michaelis and institutional inequities in the treatment of female employees.

200. In response, Defendants subjected Plaintiff to adverse actions including denial of training, isolation, exclusion from meetings, and career stagnation.

201. Meanwhile, less qualified male employees received preferential treatment and advancement.

202. Defendants' conduct was motivated by discriminatory and retaliatory animus, violating Plaintiff's rights under the Equal Protection Clause of the Fourteenth Amendment and 42 U.S.C. § 1983.

203. Defendants' actions were willful, malicious, taken in bad faith, and outside the scope of any legitimate official duties, entitling Plaintiff to punitive damages.

**COUNT VIII:**

**Monell Liability for Policy, Custom, or Practice Under 42 U.S.C. § 1983**

**(Against Defendant SCC)**

204. Plaintiff realleges and incorporates by reference all preceding paragraphs.

205.   Defendant SCC maintained a policy, custom, or practice of failing to meaningfully investigate or address complaints of sex discrimination.

206.   SCC's administration routinely protected male administrators despite knowledge of repeated inappropriate conduct and failed to document or formally respond to complaints.

207.   SCC allowed discrimination and retaliation to persist by failing to supervise or discipline high-level administrators, and by denying advancement to qualified women.

208.   These acts and omissions reflect a deliberate indifference to the rights of female employees and caused the constitutional violations suffered by Plaintiff.

209.   Defendant SCC is liable under 42 U.S.C. § 1983 pursuant to *Monell v. Department of Social Services*, 436 U.S. 658 (1978).

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff respectfully requests the following relief:

A. **Economic Damages**: Award Plaintiff all economic damages resulting from Defendants' unlawful conduct, including but not limited to back pay, front pay, lost benefits, and any other financial losses resulting from discriminatory and retaliatory actions, including funds withdrawn from Plaintiff's 401(k).

B. **Compensatory Damages**: Award Plaintiff damages for reputational harm, including any harm to her professional standing and career prospects, emotional distress, pain and suffering, and mental anguish under Title VII, NFEPA, and 42 U.S.C. § 1983.

C. **Punitive Damages**: Award Plaintiff punitive damages Against Defendants Illich, Tangeman, and Michaelis for willful, malicious, or reckless conduct under 42 U.S.C. § 1983  and to deter others from engaging in similar discriminatory and retaliatory actions.

D. **Injunctive and Declaratory Relief**: Grant permanent injunctive relief to eliminate ongoing and prevent future sex discrimination and retaliation at Defendant Southeast Community College Area (SCC), including but not limited to the following specific measures:

   1. Mandating comprehensive, mandatory training programs for all SCC employees, including administrators, supervisors, and senior leadership, on sex discrimination, retaliation, equal employment opportunity, and

compliance with Title VII and the Nebraska Fair Employment Practice Act, to be conducted annually by qualified external experts.

2. Revising SCC's policies and procedures to establish and enforce a transparent, impartial, and prompt process for investigating complaints of discrimination and retaliation, including requirements for interviewing all relevant witnesses, documenting findings, and providing written outcomes to complainants.

3. Reforming SCC's hiring, mentorship, and promotion practices to ensure equal opportunity for all employees, irrespective of sex, through measures such as: (a) posting all leadership and senior positions for open competition; (b) implementing objective, nondiscriminatory criteria for selection and advancement; and (c) establishing a mentorship program accessible to all qualified employees.

E. **Declaratory Relief**: Declare that the actions of Defendant SCC, and its agents and employees, violate Plaintiff's rights under Title VII of the Civil Rights Act of 1964, the Nebraska Fair Employment Practice Act, the Equal Protection Clause of the Fourteenth Amendment, and 42 U.S.C. § 1983.

F. **Attorneys' Fees and Costs**: Reasonable fees, costs, and expenses under 42 U.S.C. § 1988, 42 U.S.C. § 2000e-5(k), and related statutes.

G. **Pre- and Post-Judgment Interest**: Award Plaintiff pre- and post-judgment interest on any monetary damages awarded, as provided by law.

H. **Other Relief**: Award any other relief that the Court deems just, proper, and equitable under the circumstances, including any relief necessary to fully compensate Plaintiff for the harms suffered as a result of Defendants' discriminatory and retaliatory conduct.

**RACHAEL E. MCLEOD, Plaintiff**

*Respectfully submitted,*

BY:    */s/ John D. Cartier*

John D. Cartier #26307
Cartier Law, LLC
PO Box 5241
Lincoln, Nebraska 68505
(954) 319-9832
johncartierlaw@gmail.com