IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| RACHEL E. MCLEOD,<br><br>                  Plaintiff,<br><br>vs.<br><br>SOUTHEAST COMMUNITY<br>COLLEGE AREA, et al.;<br><br>                  Defendants. | 4:25-CV-3105<br><br>MEMORANDUM AND ORDER |

This is an employment discrimination case. The plaintiff, Rachel E. McLeod, is suing her former employer, the Southeast Community College Area (SCC), and several of her alleged former supervisors, for discriminating against her on the basis of sex, and for retaliating against her for reporting discrimination.

The plaintiff alleges her employer violated her statutory rights under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, and the Nebraska Fair Employment Practice Act (NFEPA), Neb. Rev. Stat. § 48-1101 *et seq.*. She also asserts her employer and her supervisors violated her constitutional rights under 42 U.S.C. § 1983. *See* filing 15 at 21-33. This matter comes before the Court on the defendants' joint motion to dismiss for failure to state a claim. Filing 16.

## I. STANDARD OF REVIEW

To survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6), a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A claim has facial plausibility when the plaintiff pleads factual content that

allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Id.* While the Court must accept as true all facts pleaded by the non-moving party and grant all reasonable inferences from the pleadings in favor of the non-moving party, *Gallagher v. City of Clayton,* 699 F.3d 1013, 1016 (8th Cir. 2012), a pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action will not do. *Iqbal,* 556 U.S. at 678. Determining whether a complaint states a plausible claim for relief will require the reviewing court to draw on its judicial experience and common sense. *Id.* at 679.

When deciding a motion to dismiss under Rule 12(b)(6), the Court is normally limited to considering the facts alleged in the complaint. If the Court considers matters outside the pleadings, the motion to dismiss must be converted to one for summary judgment. Fed. R. Civ. P. 12(d). However, the Court may consider public records, including an administrative charge of discrimination, without converting the motion. *Blakely v. Schlumberger Tech. Corp.,* 648 F.3d 921, 931 (8th Cir. 2011); *Levy v. Ohl,* 477 F.3d 988, 991 (8th Cir. 2007).

## II. BACKGROUND

The plaintiff worked for SCC from 2014 until she was terminated in November 2024. *See* filing 15 at 1, 20. Her complaint alleges discriminatory conduct beginning in 2022. *See* filing 15 at 4. At that time, and until her termination, the plaintiff was the Administrative Director of Resource Development. Filing 15 at 1.

### *Joel Michaelis*

In May 2022, the plaintiff made a formal Title IX complaint about one of the defendants, Joel Michaelis, Vice President of Instruction. Filing 15 at 3; *see*

2

*also* 20 U.S.C. § 1681 *et seq*. The plaintiff alleges that Michaelis called a woman a "dick," and allegedly complained of a female employee as being too harsh, stating, "I guess that's just the way professional women have to behave in a man's world." Filing 15 at 3.

The plaintiff alleges that Michaelis was hired over other qualified candidates because Paul Illich, the President of SCC, had worked with Michaelis's father. *See* filing 15 at 6-7. The plaintiff made her Title IX complaint based on the two remarks detailed above. When she spoke to some of her female colleagues, they divulged other problematic behavior from Michaelis. Michaelis allegedly took a work-related Zoom meeting while visibly parked outside of a strip club. Filing 15 at 11. He also allegedly treated one of the plaintiff's female colleagues "in a sexist manner" in Administrative Team meetings (though the complaint does not elaborate on what Michaelis did or said). *See* filing 15 at 4.

The Title IX coordinator asked the plaintiff for a list of witnesses. However, the plaintiff alleges the coordinator never interviewed those witnesses, and only spoke to the plaintiff as part of his investigation. Filing 15 at 4. Around a month after the plaintiff filed her complaint, in June 2022, the Title IX coordinator told her that Michaelis's behavior did not rise to a Title IX offense. *See* filing 15 at 4.

## *Paul Illich and Bruce Tangeman*

In 2020, plaintiff told two of the defendants—Illich and Bruce Tangeman, the Vice President of Human Resources (HR)—that she was interested in growing her career, specifically in the HR and Access/Equity/Diversity departments. Filing 15 at 12. At that time, the plaintiff alleges "it was widely known at the college that" the heads of those departments would soon retire. *See* filing 15 at 11.

In January 2022, the plaintiff specifically requested mentorship and training opportunities for those positions. Tangeman allegedly brushed her off and sent her a link to training to "review on her own." Filing 15 at 12. However, Tangeman began grooming a male employee, with the same qualifications but less experience than the plaintiff, to take on a leadership role in the Human Resources department. *See* filing 15 at 12, 14. He was the Title IX coordinator responsible for the Michaelis investigation discussed above. Filing 15 at 9.

The plaintiff alleges she noticed, in July 2023, that the Title IX coordinator was getting the training she had asked for. *See* filing 15 at 9-10, 12. He was invited to one-on-one meetings with Tangeman and attended weekly HR meetings. Filing 15 at 10. The plaintiff emailed Illich and Tangeman to ask why her colleague was getting these opportunities, and to ask how the administration would fill an open Human Resources role. Filing 15 at 12. She was told that her colleague was "just helping out," and a decision about the open role would not be made until 2024. Filing 15 at 12. However, the coordinator's role was "quietly reclassified" in July 2023, to "Administrative Director—Title IX Coordinator, Institutional Compliance & Labor Relations." Filing 15 at 10. He received a raise and a new title, for a job that was never posted internally or externally. Filing 15 at 10. The plaintiff alleges this was an irregular hiring process.

The plaintiff alleges that the Title IX coordinator received the promotion, in part, as a "reward for his willingness . . . to do an incomplete investigation" of the plaintiff's complaint against Michaelis. Filing 15 at 13. She also believes he was favored over the plaintiff because he was a man, and to retaliate against her for reporting Michaelis at all. *See* filing 15 at 13.

The plaintiff alleges that, under Illich's leadership, preferential treatment of male employees was common at SCC. *See* filing 15 at 9. She lists

three events where senior directors retired, and "similarly situated" male candidates were selected over female candidates to fill those roles. Filing 15 at 9. In May 2022, a male was selected for a new position for which there was no internal or external opportunity to apply. Filing 15 at 8.

At some time (the plaintiff doesn't specify), Illich selected a male candidate for another new position over the hiring team's recommended female candidate. Filing 15 at 7. When the male struggled in the position, Illich went out of his way to prevent his chosen employee from being demoted, and enlisted the help from the plaintiff and her female colleagues to support the allegedly unqualified male. *See* filing 15 at 7. The plaintiff alleges that Illich often reassigned duties to female employees when men in leadership did not have the skills to do their jobs. *See* filing 15 at 4-5.

### *Amy Jorgens*

The plaintiff alleges that Illich and Tangeman tried to hide the Title IX coordinator's promotion from her. In late August 2023, she told Amy Jorgens, the Vice President of Administrative Services, and her direct supervisor, that she would be filing a charge of discrimination with the Nebraska Equal Opportunity Commission (NEOC). Filing 15 at 15.

Shortly after, on September 1, Jorgens complained about the plaintiff's work performance, even though it was an "error" by Jorgens. Filing 15 at 15. The plaintiff asked for a performance evaluation several times, but Jorgens refused to complete one. Filing 15 at 15. In her ten years working at SCC, the plaintiff had never had her performance evaluated. Filing 15 at 15.

In late October that year, the plaintiff emailed Jorgens to "express concerns" about the lack of an evaluation, and said she believed Jorgens "was trying to drum up performance issues to include in a performance evaluation."

5

Filing 15 at 15. Jorgens denied that allegation, and said she had not performed an evaluation because she was busy.

In February 2024, the plaintiff was told she was being investigated due to employee complaints. Filing 15 at 16. The plaintiff alleges that Illich and Tangeman "had been saving up contrived incidents . . . in retaliation for Plaintiff filing the first NEOC charge." Filing 15 at 16. The plaintiff's coworkers allegedly complained about the plaintiff "expressing concerns about discriminatory practices and exclusionary behavior," and because the plaintiff "expressed concerns . . . about discriminatory and retaliatory behavior." Filing 15 at 16.

The plaintiff filed her second charge of discrimination in April 2024, based on alleged retaliatory actions. Filing 15 at 16. She also sent a complaint to the SCC Board of Governors in June 2024. Filing 15 at 17. Jorgens and Tangeman placed the plaintiff on a performance improvement plan (PIP) on July 2, 2024, in response to the findings of their February investigation. Filing 15 at 17. According to the plaintiff, the PIP was based on the "quality" of her work, though the only evidence was that the plaintiff "almost missed a deadline." Filing 15 at 17. The PIP prohibited the plaintiff "from speaking about anything not explicitly related to the duties of her position, and required [her] to complete a 'restorative process' with the complainants." Filing 15 at 17.

Later that month, the plaintiff applied for a promotion. Filing 15 at 17. She alleges that set up an interview for August 2, 2024, but the date was allegedly pushed back a week, after all the other interviews were to be completed, due to an unspecified "conflict." Filing 15 at 18. At her interview, only two members of the interview team were present, due to unspecified travel commitments. Filing 15 at 18. The plaintiff did not get the job. Filing 15 at 19.

6

In September 2024, Jorgens removed the plaintiff from a project, which "ma[de] it impossible for" the plaintiff to comply with her PIP. Filing 15 at 19. In October, Tangeman and Jorgens modified her PIP to "preclude" her from meetings that included complainants from the February 2024 investigation. Filing 15 at 19-20.

The plaintiff complained about Jorgens to HR, for not providing a performance evaluation, retaliating against her, and for holding the plaintiff to "higher standards of conduct than others favored by" Illich. Filing 15 at 19. She asked for an interim supervisor while SCC reviewed her complaint, but that request was ignored. *See* filing 15 at 20.

The plaintiff met with someone in the HR department on November 13, 2024, and was given "her first warning for violating her PIP." Filing 15 at 20. The plaintiff alleges that the HR representative said the plaintiff violated her PIP by speaking about her complaint against Jorgens. Filing 15 at 20. The plaintiff was told that if she violated her PIP a second time, she would be put on administrative leave.

At that meeting, the plaintiff asked "why she was not allowed to advocate for herself in a meeting," and why she could not discuss the complaint against Jorgens. Filing 15 at 20. The HR representative "then stated that Plaintiff had violated the PIP a second time and put Plaintiff on administrative leave right then and there." Filing 15 at 20. On November 22, 2024, the plaintiff was told her employment with SCC was terminated, effective December 2, 2024. Filing 15 at 20. She amended her second NEOC complaint accordingly.

## III. DISCUSSION

The plaintiff raises several theories of recovery for the alleged discrimination:

- SCC discriminated against her on the basis of sex, and retaliated against her for reporting discrimination, violating Title VII and the NFEPA;

- Illich, Tangeman, Jorgens, and Michaelis, in their individual capacities, discriminated against the plaintiff on the basis of sex, and retaliated against her for reporting discrimination, violating the NFEPA, the Equal Protection Clause, U.S. CONST. amend. XIV, § 1, and the First Amendment, U.S. CONST. amend. I; and

- SCC had a widespread pattern or practice of sex discrimination, which infringed on the plaintiff's First and Fourteenth Amendment rights.

The defendants have moved to dismiss all of the plaintiff's claims.

## 1. ADVERSE EMPLOYMENT ACTIONS

Each of the plaintiff's claims require her to show she suffered an adverse employment action. *See Woods v. Collins,* 150 F.4th 967, 972, 973 (8th Cir. 2025) (Title VII); *Knapp v. Ruser,* 901 N.W.2d 31, 39 (Neb. 2017) (NFEPA); *Grooms v. Privette,* 127 F.4th 730, 734 (8th Cir. 2025) (First Amendment); *Hager v. Ark. Dep't of Health,* 735 F.3d 1009, 1014 (8th Cir. 2013) (Equal Protection). An adverse employment action is one that causes an employee "some harm" involving her employment terms or conditions. *See Muldrow v. City of St. Louis, Mo.*, 601 U.S. 346, 350 (2024).

The plaintiff raises several "harms" she argues amount to discrete adverse employment actions. The plaintiff alleges that SCC denied her requests for promotions and specialized training, refused to give her a

8

performance evaluation, put her on a PIP, reassigned her responsibilities, and, ultimately, terminated her. *See* filing 23 at 10-11. She does not distinguish which adverse acts relate to which claim(s).

The Court agrees that, at this early stage of the proceedings, most of the actions alleged constitute at least "some harm," with one exception: the alleged "failure to be evaluated." Even an unfavorable performance evaluation is not an adverse employment action unless the employer uses it to "detrimentally alter the terms and conditions of the recipient's employment." *Clegg v. Ark. Dep't of Corr.*, 496 F.3d 922, 927 (8th Cir. 2007), *abrogated on other grounds by* *Torgerson v. City of Rochester*, 643 F.3d 1031 (8th Cir. 2011); *Okruhlik v. Univ. of Ark.*, 395 F.3d 872, 879-80 (8th Cir. 2005); *cf. Muldrow*, 601 U.S. at 359.

The plaintiff alleged the discrimination started after Illich was hired, but she also alleged that she never, even before the alleged discrimination, received an evaluation. Filing 15 at 15. The *lack* of performance evaluation is not connected to any of the terms and conditions of her employment. There's no allegation that the defendants somehow used the lack of a performance evaluation to alter the terms and conditions of her employment. The alleged failure to complete a performance evaluation might be relevant to the plaintiff's other claims, but it is not an independent, discrete adverse employment action. The remaining events satisfy the plaintiff's burden of pleading an adverse employment action for her claims.

## 2. TITLE VII AND THE NFEPA

### (a) Individual Liability under the NFEPA

The complaint asserts claims against the defendants in their individual capacities under the NFEPA. The Court agrees with the defendants that the

NFEPA provides only liability against an employer, not individual employees. *See* Neb. Rev. Stat. §§ 48-1102, 48-1104. The NFEPA is patterned after, and interpreted in accordance with, Title VII, which does not permit individual liability for employment discrimination. *Powell v. Yellow Book USA, Inc.*, 445 F.3d 1074, 1079 (8th Cir. 2006) (citing *Smith v. St. Bernards Reg'l Med. Ctr.*, 19 F.3d 1254, 1255 (8th Cir. 1994)). Accordingly, the NFEPA claims against the individual defendants must be dismissed.

### (b) Exhaustion

The defendants assert some of the alleged discrete employment actions were not administratively exhausted. *See* filing 18 at 44. And, they argue any alleged actions which occurred three hundred days before she filed her first NEOC charge are time-barred.

Before seeking a judicial remedy for alleged employment discrimination based on sex or gender, a claimant must file a charge with the EEOC and the NEOC. § 2000e-5(f)(1); Neb. Rev. Stat. § 48-1120.01. Each discrete adverse employment action must be individually addressed in the administrative charge. *Weatherly v. Ford Motor Co.*, 994 F.3d 940, 944 (8th Cir. 2021). The NFEPA requires an employee to file an administrative charge within three hundred days of the alleged unlawful employment action. Neb. Rev. Stat. § 48-1118(2).

None of the discrete employment actions described in the plaintiff's brief, detailed above, occurred before the three hundred day window expired. To that end, she appears to have abandoned her claims of discrimination and retaliation involving Michaelis. *See* filing 23 at 10-11; NECivR 39.2(c). Those complaints appear to be time-barred: The plaintiff alleged the discrimination and retaliation occurred on some unspecified date in May 2022, but her NEOC complaint was filed on September 6, 2023. *See* filing 17-1 at 1. Assuming the

comments occurred on May 31, 2022, that is at least 463 days between events.

That doesn't mean the acts alleged by Michaelis are irrelevant to the plaintiff's claims. Time-barred prior acts of discrimination "may be used as background evidence in support of" the plaintiff's timely claims. *Wedow v. City of Kansas City*, 442 F.3d 661, 670 (8th Cir. 2006). And the alleged favorable treatment of Michaelis may also be relevant. But there are no other allegations of Michaelis, directly or indirectly, discriminating or retaliating against the plaintiff. Therefore, the plaintiff's independent claims related to Michaelis are dismissed.

### (c) Discrimination

The plaintiff's Title VII and NFEPA discrimination claims require her to show she suffered an adverse employment action because of her sex. *See Warmington v. Bd. of Regents of Univ. of Minn.*, 998 F.3d 789, 795-96 (8th Cir. 2021). In the absence of allegations of direct discrimination, a complaint, read as a whole, must contain circumstances that give rise to an inference of discrimination. *See Warmington,* 998 F.3d at 797, 798. The defendants argue that the plaintiff failed to allege facts showing an adverse action was taken against her "because of" her sex. Filing 18 at 12.

Relying on *Bennett v. Nucor Corp.*, 656 F.3d 802 (8th Cir. 2011), a decision based on a summary judgment record, the defendants argue the plaintiff did not plead specific enough facts to show she and the Title IX coordinator were "similarly situated" for purposes of showing disparate treatment. Filing 18 at 12. But a plaintiff "need not set forth detailed factual allegations, or specific facts that describe the evidence to be presented." *Warmington,* 998 F.3d at 795-96. Rather, "the complaint must include sufficient factual allegations to provide the grounds on which the claim rests."

11

*Id.* at 796. The plaintiff's failure to plead *precisely* the ways in which she was similarly situated to the Title IX Coordinator who received favorable treatment is not fatal to her claim.

The plaintiff alleges the defendants failed to train and failed to promote her. These are actionable adverse employment actions. *E.g., Bennett*, 656 F.3d at 819, 820. The plaintiff alleged that the defendants gave training and promotions to a similarly situated male employee, and denied her opportunities to even *apply* for other promotions by selecting and hiring male candidates outside of the normal interview procedure. The plaintiff also alleged a pattern of discrimination, where men were always favored over women in leadership roles. *See* filing 15 at 7, 9.

An employer's failure to follow its own policies may give rise to an inference of discrimination. *E.g., Grant v. City of Blytheville, Ark.*, 841 F.3d 767, 776 (8th Cir. 2016). The defendants assert the plaintiff's allegations only amount to cronyism, which isn't illegal under Title VII or the NFEPA. *See* filing 18 at 17-18. But if an employer's favoritism *always* benefits men over women, those allegations—at this very early stage of the proceedings—support an inference that an adverse employment action was, at least in part, motivated by sex. *See Bostock v. Clayton Cnty., Ga.*, 590 U.S. 644, 665 (2020) ("the plaintiff's sex need not be the sole or primary cause of the employer's adverse action"); *cf. Tenge v. Phillips Modern Ag Co.*, 446 F.3d 903, 910 (8th Cir. 2006) ("It may well be that an employer who always fires the woman when two employees engage in an office romance would be guilty of gender discrimination." (quoting *Mercer v. City of Cedar Rapids*, 308 F.3d 840, 845 (8th Cir. 2002))).

That said, nonspecific allegations of being treated "in a sexist manner," *see* filing 15 at 4, do not state an actionable claim under any civil rights statute.

12

Neither do vague references to nepotism or favoritism. However, the plaintiff has at least alleged a clear practice and pattern, with specific examples, that SCC gave preferential treatment to men by providing them training opportunities and selecting them for leadership positions over more qualified and more experienced women. *Cf. Tenge*, 446 F.3d at 909 (claims of "widespread sexual favoritism" may implicate Title VII).

The plaintiff appears to assert the other alleged adverse actions involving discipline—placing her on a PIP, removing her from a project, and terminating her—were also sex-based discrimination. But based on the facts alleged, there's no inference that can be drawn that those acts were because of her sex. She did not allege similarly situated men were treated differently for the same conduct, nor did she allege a pattern or practice of disciplining women more harshly than men. Rather, those actions are better framed in the plaintiff's retaliation claims, discussed below.

### (d) Retaliation

Title VII and the NFEPA prevent employers from retaliating against employees "who have acted to vindicate their statutorily protected rights by reporting harassment or discrimination in the workplace." *Warren v. Kemp*, 79 F.4th 967, 972 (8th Cir. 2023); 42 U.S.C. § 2000e-3(a); Neb. Rev. Stat. § 48-1114. A claim for retaliation requires a plaintiff to show: (1) she engaged in a protected activity; (2) she suffered an adverse employment action; and (3) the adverse employment action occurred because she engaged in the protected activity. *Hunt v. Neb. Pub. Power Dist.*, 282 F.3d 1021, 1028 (8th Cir. 2002); *Warren*, 79 F.4th at 973. The defendants assert the facts in the complaint fail to support an inference of any element of these claims.

First, the defendants assert the plaintiff did not allege that she engaged

in any protected activity. A plaintiff need not establish that the conduct opposed was in fact prohibited under Title VII; rather, she need only demonstrate a "good faith, reasonable belief that the underlying challenged conduct violated Title VII." *Warren*, 79 F.4th at 974.

The Court is satisfied that the plaintiff filed a charge of discrimination in good faith. The defendants characterize the plaintiff's discrimination charge as sour grapes about someone else's promotion. But for the reasons explained above, the facts alleged support an inference of sex-based discrimination. However, the incidents involving Michaelis are time-barred. So, the plaintiff's protected activity for her retaliation claims is her charge of discrimination, filed September 6, 2023.

And, the plaintiff has adequately alleged employment actions that adversely affected the terms and conditions of her employment (also explained above). The plaintiff alleges that, after her NEOC charge, her employer placed her on a PIP, reassigned her responsibilities, and terminated her. The PIP was implemented after an investigation that began in February 2024, involving employee complaints that the plaintiff alleges were inaccurate or hyperbolic. The defendants argue the amount of time—5 months—between the protected activity and the allegedly retaliatory investigation destroys any causal connection.

It's true that the time between a protected activity and adverse action must be "very close" if a complaint "relies on mere temporal proximity" to establish causation. *Meinen v. Bi-State Dev. Agency*, 101 F.4th 947, 950 (8th Cir. 2024). But the complaint contains facts that, beyond a temporal connection, permit an inference of a retaliatory motive. The plaintiff alleged that was placed on a PIP specifically because she complained to her coworkers about discrimination and retaliation in the workplace. Filing 15 at 16. She

14

alleged that she was ultimately terminated because she asked a question about a complaint she made against her supervisor. Filing 15 at 20. These facts support a direct causal link between the plaintiff's complaints about discrimination and the adverse employment actions.

The plaintiff also alleged that SCC subjected her to an unusual interview process for a promotion. Filing 15 at 18. An employer's failure to follow its own policies can support an inference of an unlawful motive at this *prima facie* stage of a case. *See Grant*, 841 F.3d at 776. Viewing the complaint as a whole, the plaintiff has adequately stated a claim that SCC retaliated against her for complaining about sex discrimination in her workplace.

### 3. CONSTITUTIONAL VIOLATIONS

The plaintiff also asserts the defendants, in their individual and official capacities, violated her constitutional rights; specifically, her First Amendment right to be free from retaliation, and her Fourteenth Amendment right to equal protection. In the employment context, claims that an employer violated the Constitution require a plaintiff to prove the same elements as Title VII, though are not subject to the same procedural requirements. *See Henley v. Brown*, 686 F.3d 634, 643 (8th Cir. 2012); *Tyler v. Univ. of Ark. Bd. of Trs.*, 628 F.3d 980, 986 (8th Cir. 2011).

Intentional gender discrimination in public employment by persons acting under color of state law violates the Equal Protection Clause of the Fourteenth Amendment, and is actionable under § 1983. *Ottman v. City of Independence, Mo.*, 341 F.3d 751, 756 (8th Cir. 2003). And retaliating against an employee for filing an NEOC charge is prohibited under the First Amendment. *See Tyler*, 628 F.3d at 986.

15

(a) *Monell* Liability

The plaintiff seeks to hold SCC, a political subdivision, liable for the alleged discrimination and retaliation. To state a claim under § 1983 against a political subdivision, a plaintiff must allege an act performed under color of state law that resulted in a constitutional injury, and must identify either an official policy or a widespread custom or practice of the political subdivision that provided the moving force behind the unconstitutional act and the plaintiff's resulting injury. *Springdale Educ. Ass'n v. Springdale Sch. Dist.*, 133 F.3d 649, 651 (8th Cir. 1998).

However, a political subdivision cannot be liable for employing a tortfeasor. *E.g.*, *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978). Rather, § 1983 liability attaches to a governmental entity only if a plaintiff shows that a constitutional violation resulted from an official policy, an unofficial custom, or a deliberately indifferent failure to train or supervise. *Mick v. Raines*, 883 F.3d 1075, 1079 (8th Cir. 2018).

As discussed above, the plaintiff has alleged a widespread custom of favoritism resulting in sex discrimination, perpetrated by Illich, SCC's president. The plaintiff's allegations support an inference that SCC had a "widespread" failure to comply with the official policy involving sexual discrimination, which, in turn, supports an inference—at this early stage of the case—that SCC had a practice or custom of pervasive unconstitutional conduct. *See* *Brewington v. Keener*, 902 F.3d 796, 801 (8th Cir. 2018). This is the pleading stage, not the proving stage, and there is a reasonable expectation that discovery will reveal evidence to support the plaintiff's claims. *See* *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

However, the plaintiff has not identified a "policy or custom" regarding the allegedly *retaliatory* conduct. The complaint does not contain similar

16

widespread allegations about the wrongful treatment of employees who reported sex discrimination. While the plaintiff alleges that several individual employees retaliated against her, the complaint does not contain facts supporting the claim that such behavior was widespread, or that other employees were similarly discouraged from reporting discrimination. The plaintiff has not alleged widespread retaliatory conduct so as to state a claim for violating her First Amendment rights under § 1983. This claim will therefore be dismissed.

### (b) Qualified Immunity

The individual defendants claim they are entitled to qualified immunity. Filing 18 at 10. Qualified immunity protects public employees from liability unless their alleged conduct violated clearly established rights of which a reasonable person in their position would know. *E.g., Jenkins v. Univ. of Minn.*, 838 F.3d 938, 944 (8th Cir. 2016). The defendants argue that the plaintiff failed to plead facts showing a constitutional violation.

To begin, the Court must sort out which individual defendants are alleged to have violated which constitutional rights. It appears, from the facts in the complaint, that Michaelis, Illich, and Tangeman allegedly violated her Fourteenth Amendment rights, while Tangeman and Jorgens violated her First Amendment rights. Illich and Tangeman allegedly demonstrated sex-based favoritism in choosing who to train, hire, or promote. Michaelis allegedly made inappropriate sex-based comments. And Tangeman and Jorgens placed the plaintiff on an allegedly retaliatory PIP for reporting discrimination.[1]

---

[1] In her brief, the plaintiff argues Illich "approved" the plaintiff's termination, filing 23 at 21, but the facts alleged in the complaint involving her termination do not mention Illich at all.

17

For the same reasons the plaintiff has adequately pled a Title VII discrimination claim, she has stated a claim under § 1983 for violating her right to equal protection. The plaintiff's right to be free from disparate treatment on the basis of sex was clearly established at the time the defendants failed to promote her. Illich and Tangeman are not entitled, at this early stage of the proceedings, to qualified immunity on the plaintiff's Fourteenth Amendment claims.

However, the alleged conduct by Michaelis does not infringe on any of the plaintiff's rights. The alleged conduct was not even directed at the plaintiff, apart from conclusory statements that Michaelis "imped[ed] her ability to do her job." *See* filing 15 at 3. The handful of allegations involving Michaelis do not rise to any actionable adverse conduct. The claims against Michaelis will be dismissed.

The defendants argue that the plaintiff's NEOC charge was not protected by the First Amendment. Filing 18 at 31. But it was clearly established, under Eighth Circuit precedent, that filing a charge of discrimination is protected under the First Amendment, and it is unlawful to retaliate against an employee for filing an EEOC (or NEOC) charge. *See Tyler*, 628 F.3d at 986. And as explained above, the plaintiff has pled facts that directly support a causal connection between her protected activity and the adverse employment actions. Tangeman and Jorgens[2] are not entitled to qualified immunity on the

---

*See* filing 15 at 20. There's no indication, other than conclusory assertions, that Illich was involved in the decision to punish and ultimately terminate the plaintiff. The First Amendment claims against Illich will be dismissed.

[2] The defendants also argue that Jorgens was improperly added in the plaintiff's amended complaint. That argument is based on the requirement in Title VII and the NFEPA to file a lawsuit within 90 days after receiving a right-to-sue letter. Filing 18 at 43. However, because

18

plaintiff's First Amendment claim.

## IV. CONCLUSION

The facts in the complaint paint a picture of a "good ol' boys club." It may, or may not, be true that it was mere happenstance that men "always" benefited from the alleged cronyism, and sex was not a factor in the decisions to promote or hire men over women. But this is the pleading stage, and inferences must be drawn in the plaintiff's favor.

The allegations in the complaint, at this stage, support claims against SCC under Title VII and the NFEPA for discrimination and retaliation, and under § 1983 for violations of the Fourteenth Amendment. They also support claims against most of the defendants in their individual capacities—Illich and Tangeman for violations of the Equal Protection Clause, and Tangeman and Jorgens for violations of the First Amendment. The remaining claims will be dismissed.

IT IS ORDERED:

1.  The defendant's motion to dismiss (filing 16) is granted in part and denied in part.

2.  The plaintiff's claims against Joel Michaelis are dismissed.

3.  The Clerk of the Court is directed to terminate Joel Michaelis

---

the plaintiff cannot sue Jorgens in her individual capacity, and the § 1983 claims are not subject to the procedural requirements in Title VII, Jorgens was properly added as a defendant.

19

as a party.

4. This case is referred to the Magistrate Judge for case progression.

Dated this 24th day of March, 2026.

BY THE COURT:

John M. Gerrard
Senior United States District Judge

20